## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                            CASE NO: 2:15-cr-153-FtM-29CM

AMAURY MATIAS

_____

### REPORT AND RECOMMENDATION[1]

Before the Court is Defendant's Motion for Pre-Trial Suppression Hearing and Memorandum of Law (Doc. 18), filed on December 31, 2015, which was referred to the undersigned by the Honorable John E. Steele for a Report and Recommendation. The United States filed its response in opposition on January 13, 2016.   Doc. 20. The undersigned held an evidentiary hearing on February 4, 2016.   This case currently is set for the trial term beginning April 4, 2016, with a status conference to be held on March 7, 2016.   Doc. 27.

### I.   Background and Summary of Arguments

Defendant, Amaury Matias, is charged in a single count indictment with knowingly possessing with the intent to distribute, and aiding and abetting such possession, of 500 grams or more of a mixture or substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii)(II) and 18

---

[1] A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

U.S.C. § 2.   Doc. 1 at 1.   Defendant seeks to suppress any and all statements and evidence, including the approximately 2 kilograms of cocaine, seized from Defendant on or about October 16, 2015.   Doc. 18 at 3, 12.

Defendant argues that the United States violated his rights under the Fourth and Fifth Amendments of the United States Constitution when Trooper Martin Hernandez stopped Defendant without reasonable suspicion or probable cause that Defendant had violated Fla. Stat. § 316.0895(1), which states:

> [t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon, and the condition of, the highway.

*Id.* at 1-4.   Defendant also contends that Fla. Stat. § 316.0895(1) is void for vagueness and in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution.   *Id.* at 7.   The United States responds that Trooper Hernandez had probable cause for the traffic stop.   Doc. 20 at 6.   Additionally, the United States argues that Fla. Stat. § 316.0895(1) is not unconstitutionally vague. *Id.* at 12.

The undersigned concludes that Trooper Hernandez had probable cause to conduct the traffic stop, and the evidence subsequently identified was found pursuant to a lawful search of the vehicle.   Additionally, the undersigned finds that Fla. Stat. § 316.0895(1) is not unconstitutionally vague.   The undersigned therefore respectfully recommends that Defendant's Motion be denied.

## II.    Summary of the Evidence

The United States called Trooper Martin Hernandez and Special Agent Steve Duquette to testify at the suppression hearing.   Defendant called Investigator Bernardo Nieves.   The parties introduced nine joint exhibits, which were admitted into evidence: (1) a copy of the Dash Camera ("Dash Cam") audio/video from Trooper Martin Hernandez's Florida Highway Patrol ("FHP") cruiser on October 9, 2015; (2) stipulation between the United States and Defendant; (3) still photo taken from Exhibit 1; and (4.A – 4.F) six photographs of vehicle that Defendant Amaury Matias was driving on October 9, 2015.   Doc. 34.   The testimony and evidence are summarized below.

### a.  *Trooper Martin Hernandez*[2]

On October 9, 2015 at approximately 11:00 a.m., Trooper Hernandez was traveling from Tampa, Florida when he received a call from Trooper Michael Grider. Doc. 40 at 14-15, 17.   Trooper Grider indicated that he was stationed at the Racetrac service station on State Road 82 and Ortiz waiting for a phone call from the DEA. *Id.* at 18.   Trooper Hernandez met Trooper Grider and Trooper Sean McCormick at the Racetrac approximately forty-five minutes later.   *Id.* 18-19.   Once he arrived, Trooper Hernandez was told that DEA had been watching a particular car and a dark-colored van down the road from the service station and thought the vehicles were about to get back on the interstate.   *Id.* at 19-20.   The DEA requested that

---

[2] Trooper Hernandez is employed by the FHP.   Doc. 40 at 7.   He joined after college and has been a state trooper his entire eighteen-year career.   *Id.* at 7-8.

Trooper Hernandez and Trooper Grider get into position because the vehicles were possibly headed back to Miami, Florida. *Id.* at 20. Trooper Grider also informed Trooper Hernandez that there was reason to believe that there was cocaine in the car. *Id.* Trooper Grider asked Trooper Hernandez to make a probable cause traffic stop of the target car. *Id.*

Trooper Hernandez positioned his patrol car on the southbound on-ramp of Interstate 75 at Daniels Parkway. *Id.* at 21. From that vantage point, Trooper Hernandez was able to see all of the lanes of traffic traveling southbound on I-75. *Id.* When he saw the target vehicles traveling in the center lane, he noticed that a dark-colored blue four-door Acura was following a dark-colored van too closely, and the Acura had dark-colored tint. *Id.* at 21-22.

As the vehicles passed Trooper Hernandez, he visually observed the speed of the Acura.[3] *Id.* at 23. He also saw that the Acura appeared to be following the van too closely. *Id.* at 24. He testified there was about one and one-half to two car lengths between the van and the Acura. *Id.* Based on Trooper Hernandez's training and experience, the proper distance between the two vehicles should have been at least seven car lengths, one car length for every ten miles per hour of speed. *Id.* at 11-12, 24. From his posted position, Trooper Hernandez also observed the dark tint on the Acura, which appeared to be darker than legally permissible under Florida law. *Id.*

---

[3] Trooper Hernandez testified he was trained to make such visual observations during his certification process for radar or laser. Doc. 40 at 23.

Trooper Hernandez then proceeded into traffic and moved from the center lane to the left lane in an attempt to overtake the Acura. *Id.* at 25. As he approached the Acura, he noticed that it still appeared to be following the van too closely; but as he got closer, the Acura and the van began to separate. *Id.* Trooper Hernandez got a little closer to the side of the Acura to determine whether the driver, later identified as Defendant Amaury Matias, was wearing a seat belt. *Id.* He noticed Defendant was wearing his seatbelt and had clearly slowed down. *Id.* Trooper Hernandez then turned on his lights and the patrol car's Dash Cam. *Id.* at 26. Although he had just turned on the camera, the recording started thirty seconds earlier. *Id.*[4]

After Trooper Hernandez activated his lights, Defendant pulled over to the right shoulder of the road. *Id.* The dark-colored van continued going southbound on I-75. *Id.* at 26-27. Trooper Hernandez exited his patrol car and approached Defendant's vehicle. *Id.* at 26. Trooper Hernandez testified that he told Defendant he pulled him over because he was following too closely and that his window tint was too dark. *Id.* Trooper Hernandez asked Defendant to roll down the front and back windows of the Acura so he could test the window tint. *Id.* He found the tint on the front window to be too dark under Florida law. *Id.* Trooper Hernandez testified that when he asked Defendant for his license, Defendant appeared to be very nervous and was shaking as he handed it over. *Id.*

---

[4] Trooper Hernandez testified the camera captures what it records for thirty seconds before it is activated. Doc. 40 at 26.

During the traffic stop, Defendant first stated that he was coming from Tampa, then he quickly changed his statement and said he was coming from Orlando.   *Id.* at 28.   Defendant told the officer that he was routing trips from Miami to the Orlando amusement parks in anticipation of his son's visit from Puerto Rico.   *Id.* at 28-29.   Trooper Hernandez expressed doubt about Defendant's story first because based on the time Defendant said he left Miami, there were not sufficient hours in the day to have made the trip he said he was making.   *Id.* at 29.   Also, Defendant did not tell Trooper Hernandez that he had not gotten off the interstate in Fort Myers, which was inconsistent with the information the officer had received from Trooper Grider and Trooper McCormick.   *Id.* at 29-30.

During Trooper Hernandez's testimony, the United States played the Dash Cam video.   *Id.* at 30-33.   In the video, Trooper Hernandez told Defendant that the reason he was stopping him was because "you were following that van a little too close" and stated he also was going to check the car's window tint with his tint meter. Doc. 40 at 31-32; Ex. 1 at 13:48.54-13:49:32.[5]   Trooper Hernandez described the maximum tint percentages (28% on the front window and 15% on the back); and, after testing both windows, told Defendant the tint on the front side window was 17%, which was too dark under Florida law.   Doc. 40 at 31-32; Ex. 1 at 13:50:22. Trooper Hernandez then told Defendant he was going to issue him a warning for following the van too closely.   Doc. 40 at 32.   Trooper Hernandez told Defendant he

---

[5] The Court independently reviewed the Dash Cam video.   To the extent there are inconsistencies in this Report and Recommendation between what is quoted from the video and the official transcript, the quotations herein are based on the Court's review of the video.

was supposed to keep a distance of one car length for every ten miles per hour.   Ex. 1 at 13:51:38.   He further told Defendant:   "So if you're going – when I come up next to you you're going about seventy-two [miles per hour], you got to keep about seven cars, okay?   You weren't about seven cars away.   You're following way too close."   Doc. 40 at 33; Ex. 1 at 13:51:40-13:51:48.   Trooper Hernandez testified that this standard – one car length for every ten miles per hour of speed – was taught to the troopers at the academy.   Doc. 40 at 12, 52.   He also learned the standard from other troopers with whom he has worked over the past eighteen years.   *Id.* at 12, 52-53.   The trooper testified that the standard, however, would change under different weather conditions or based on the type of vehicle, such as a tractor-trailer. *Id.* at 53.

After the video was played, Trooper Hernandez testified that the distance between the van and the Acura that he observed while stationary on the southbound ramp of I-75 was not captured by the Dash Cam video.   *Id.* at 34.   The Dash Cam video only captured the thirty seconds before he activated his emergency lights.   *Id.* Trooper Hernandez also stated that the Dash Cam video is two dimensional, so things appear farther away in the video than they actually are.   *Id.* at 35.   When he saw the two vehicles, it appeared to him that Defendant was following the van too closely – about two car lengths away – which was part of the reason for the stop. *Id.*   The other part was the window tint violation.   *Id.* at 35-36.

On cross-examination, although Trooper Hernandez admitted that he was looking for probable cause to stop Defendant, he knew that if he did not find probable

cause he could not make the stop.   *Id.* at 37.   Trooper Hernandez agreed that the main reason he was looking for probable cause to make the stop was to investigate Defendant for drugs, and it was not just a random stop, which was why shortly after the stop Trooper Grider arrived at the scene with his K-9.   *Id.*

Trooper Hernandez further testified on cross that the following day he prepared an offense report and probable cause affidavit.   *Id.* at 45.   In the offense report, Trooper Hernandez indicated Defendant was following the van "what appeared to be too closely" but admitted he did not specify the distance between the vehicles – e.g., the one and a half to two car lengths of which he had testified.   *Id.* at 45-46.   Trooper Hernandez also clarified his earlier testimony – that his observation of when Defendant was following the van too closely was when he initially saw Defendant while he was posted at the bottom of the ramp and not when he pulled up next to him.   *Id.* at 50.

Trooper Hernandez first observed the Acura and van from his driver's side window, from his position at a slight angle but almost parallel to traffic.   Doc. 40 at 56.   He explained that the Dash Cam was positioned on the passenger side of the patrol car, so it did not capture a full 180 degrees.   *Id.* at 57.   Instead it captured most of the view in front of his vehicle – about three quarters of the hood – which included approximately 10% of the right side of the hood and 30% of the left.   *Id.*

Trooper Hernandez later was shown Joint Exhibit 3, a still image from the Dash Cam video.   *Id.* at 76.   He was asked whether at that point in time captured in the photograph the vehicles appeared to be too close together.   *Id.* at 77.   Trooper

Hernandez responded that at that point in time Defendant was not following too closely, reiterating that the period in which he saw Defendant following too closely was not captured by the Dash Cam video.   *Id.*

### b.  *Special Agent Steven Duquette*

The United States called Special Agent Steve Duquette to testify about the events that led up to the traffic stop.   Doc. 40 at 59-62.   He also was called to provide background for the information given to Trooper Grider and Trooper Hernandez to better establish that Trooper Hernandez had reason to believe there was cocaine in the car.   *Id.* at 64.

Defendant objected to the testimony because the United States, admittedly, had not given Defendant any discovery about the drug investigation, and thus Defendant could not properly cross-examine this witness.   *Id.* at 63.   In a discussion off the record, the Court gave the United States the option to continue the hearing to provide the discovery to Defendant, after which the agent could fully testify.   The United States instead elected to go forward.   Accordingly, the Court sustained the objection, and Agent Duquette was excused.   *Id.* at 63-65.

### c.  *Bernardo Nieves*

Defendant called Bernardo Nieves, an investigator with the Office of the Federal Defender, to testify about his calculation of the approximate distance between the Acura and the van at the moment in time in the Dash Cam video depicted in Joint Exhibit 3.   Doc. 40 at 66, 68.   He did this in several steps.   *Id.* First, Mr. Nieves obtained information from the National Highway Traffic and

Safety Administration, the Federal Highway Administration, and the Florida Department of Transportation ("FDOT") and retrieved records from FDOT for the construction of that section of the highway and the policies and procedures regarding the markings on the highway. *Id.* at 68-69. Based on that information, Mr. Nieves testified that each full white dash is ten feet long and the distance between each dash is thirty feet. *Id.* at 70. Next, referring to Joint Exhibit 3, Mr. Nieves pointed out that there were three full dashes and a partial dash between the Acura and the van. *Id.* at 69. Mr. Nieves calculated the total distance between the two cars at that particular point was 120 feet based on the number of highway markings and distance in between each marking. *Id.* at 70-71. Mr. Nieves than measured the length of the Acura -- sixteen feet long. *Id.* at 72-73; Ex. 4A-F. Based on the length of the Acura, he calculated that seven car lengths would be 112 feet (16 times 7). *Id.* at 74. Finally, taking into account the distance of the highway markings and the spaces between them depicted in Joint Exhibit 3, Mr. Nieves estimated the distance between Defendant's vehicle and the van in front to be approximately 125 feet at that point in time, more than seven car lengths. *Id.* at 74-75.

## III. Analysis

### a. *Traffic Stop*

Defendant first argues that Trooper Hernandez did not have reasonable suspicion or probable cause to stop him. Doc. 18 at 6. Defendant states that he was not in violation of Fla. Stat. § 316.0895(1) because he was following another vehicle in the middle lane of the highway at a reasonable and prudent distance. *Id.*

at 7.   Furthermore, Defendant argues that Trooper Hernandez' testimony is not credible, because initially he testified that at the time he pulled up to Defendant's Acura – which Defendant states is depicted in the still photo of the video at Joint Exhibit 3 – Defendant was following the van too closely, and then later said that the Acura following the van too closely was not depicted in the video at all.   Doc. 40 at 78-81.   Also, the officer never reported the one and one-half to two car lengths in his offense report.   *Id.*   The United States responds that Trooper Hernandez had probable cause to stop Defendant when he observed Defendant following too closely and also when he observed that the front side window tint appeared to be too dark. Doc. 20 at 6.   The United States also notes Trooper Hernandez testified that the distance depicted in Joint Exhibit 3 was not a violation of the law, but that he visually observed the vehicles being too close, which is not captured by his patrol car's video and therefore not depicted in Joint Exhibit 3.   Doc. 40 at 85-87.   The United States also argues that the trooper had independent probable cause to stop the Acura for the dark window tint.   *Id.* at 86-87.

The Fourth Amendment to the United States Constitution protects persons from unreasonable searches and seizures.   U.S. CONST. amend. IV.   A traffic stop is a seizure for purposes of the Fourth Amendment even though the purpose of the stop is limited and the resulting detention is brief.   *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).   Because traffic stops are more akin to an investigative detention than custodial arrests, courts typically analyze the legality of traffic stops under the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968).   *See Berkemer v. McCarty*,

468 U.S. 420, 439 (1984); *United States v. Sharpe*, 470 U.S. 675 (1985). To determine whether a seizure is justified, the court must determine whether the officer's actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996) (citations omitted).

Under *Terry*, an officer may conduct an investigatory stop if he has reasonable suspicion that criminal activity "may be afoot." 392 U.S. at 30. "[T]he police officer must be able to point to specific and articulable facts which, taken together with rationale inferences from those facts, reasonably warrant that intrusion." *Id.* at 21; *see also United States v. Bautista-Silva*, 567 F.3d 1266, 1272 (11th Cir. 2009) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)); *see also United States v. Torres*, 119 Fed. App'x 874, 875 (9th Cir. 2004) (the officer's inferences "must 'be grounded in objective facts and be capable of rational explanation'") (citation omitted). Courts must look at the "totality of the circumstances" to determine whether the detaining officer had reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.*

Here, the United States argues that Trooper Hernandez saw Defendant following the van too closely and further observed the front side window tint appeared to be too dark, thus he had probable cause to make the stop.   Doc. 20 at 6. With respect to the window tint, it is undisputed that the front windows of the Acura were illegally tinted, and Trooper Hernandez testified that was one of the reasons he pulled him over.   Doc. 40 at 26.   The video also depicts that shortly after the stop the trooper told Defendant that he needed to check his window tint, and after he did so determined the front windows were illegal under Florida law.   *Id.* at 31-32.   Counsel for Defendant suggested during cross-examination that the reasons Trooper Hernandez gave for stopping Defendant were merely pretext to stop the vehicle to conduct a drug investigation.   *Id.* at 36-37.   Even if Trooper Hernandez had subjective intent for stopping Defendant's Acura, provided there was probable cause for the stop, any subjective motivation of the officer does not render the stop unreasonable or unconstitutional.   *Wren*, 517 U.S. at 813 (noting "[s]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis"). Accordingly, based on his observation alone that the windows on the Acura appeared to be illegally tinted, Trooper Hernandez had probable cause to initiate the traffic stop.

Trooper Hernandez testified he also made the stop because at one and one-half to two car lengths between the vehicles, Defendant's Acura was following the van too closely under Florida law.   Doc. 40 at 35-36; *see* Fla. Stat. 316.0895(1).   The trooper testified the proper distance is one car length for every ten miles per hour of

speed, and he estimated that Defendant was going approximately seventy miles per hour.   Doc. 40 at 23-24, 33.   In *United States v. Purcell*, 236 F.3d 1274, 1276 (11th Cir. 2001), an officer initiated a traffic stop for following too closely when the defendants were traveling at seventy miles per hour and less than seven car lengths from the car in front of them.   236 F.3d. at 1276.   The defendants argued that the traffic stop was unsupported by probable cause because their car was about three car lengths behind the vehicle ahead of it.   *Id.* at 1276 n. 5.   Citing *Whren* for the proposition that a law enforcement officer may legally stop a vehicle traveling on the highway if the officer has probable cause to believe a traffic violation has occurred, Judge Hill noted the district court found "that such a distance [of three car lengths] could reasonably have been interpreted by [the officer] as violating the statute." The appellate court found "no error in this result."   *Id.*[6]

In a Ninth Circuit case addressing an Arizona statute with strikingly similar language as the Florida statute at issue here, the defendant argued that an officer lacked reasonable suspicion to justify a traffic stop for following too closely at a distance of five to fifteen feet while traveling fifty-five miles per hour, based on an Arizona law, which provided:

> The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent and shall have due regard for the speed of the vehicles on, the traffic on and the condition of the highway.

---

[6] Defendant does not appear to challenge that, if the Court credits Trooper Hernandez' testimony, one and one-half to two car lengths at the speed Defendant was traveling would have been too close under the Florida law.   *See* Doc. 18 at 7 (citing cases, including *Purcell*, in which two or three car lengths was found to be too close).   Instead, as discussed *infra*, he is questioning the veracity of the trooper's testimony concerning the distance between the two vehicles.

*Torres,* 119 Fed. App'x at 875-76.   Based on the officer's six years of experience, the officer testified that in his mind a vehicle is following too closely if that vehicle "would not have enough time to stop without hitting the other vehicle or running off of the roadway."   *Id.* at 876.   The court of appeals concluded that the officer's belief was "'objectively grounded' in valid interpretation of Arizona traffic law and based on his direct observation – the distance he observed between the two cars traveling at high speed."   *Id.*   Thus, the court held that the officer had reasonable suspicion to stop the defendant. *Id.*

Defendant argues that based on Mr. Nieves' calculation, there were more than seven car lengths between Defendant's car and the van in front when Trooper Hernandez pulled up next to him.   Doc. 40 at 80.   In fact, he asserts that at that point in time depicted in Joint Exhibit 3, there were approximately 125 feet between the vehicles, more than the 112 feet that would constitute seven car lengths.   *Id.* at 74, 80.   Trooper Hernandez conceded that at the point in time depicted in Joint Exhibit 3, Defendant was not following too closely.   *Id.* at 77.   Trooper Hernandez clarified his testimony that the time period when Defendant was following too closely was not identified in Joint Exhibit 3, but when he first observed the two vehicles from his post on the side of the highway.   *Id.*

The Court finds Defendant's argument unpersuasive, as he was not stopped for following too closely at the moment calculated by Mr. Nieves.   To the extent Defendant is challenging Trooper Hernandez' testimony because of his statement that when he pulled up to the Acura, it still appeared to be following the van too

closely (Doc. 40 at 25), the Court does not find this testimony to be inconsistent with the officer's later testimony.   The trooper consistently testified that he first observed the distance between the two vehicles as too close from the side window of his police cruiser when he was stationary on the side of the road.   *See, e.g.,* Doc. 40 at 21-22, 24, 40-41, 50, 57-58.   He testified that as he approached the Acura to make the stop, the cars began to separate.   Doc. 40 at 25.   He also consistently testified that at the random moment (selected by Defendant) in the video, as depicted by the still photograph in Joint Exhibit 3, the vehicles were not too close together, and that the closeness he observed was not captured by his Dash Cam.   *Id.* at 40-41, 77. Having carefully viewed the video and observed the testimony of the trooper, the Court credits the trooper's testimony this regard.

Defendant further questions the veracity of Trooper Hernandez' testimony concerning the one and one-half car lengths between the two vehicles.   Doc. 40 at 78-79.   He points out that when Trooper Hernandez initially approached the Acura after he pulled over Defendant, the trooper told him that he stopped Defendant because he was following "a little too close," and that Trooper Hernandez never mentions in any of his reports or to Defendant at the time of the stop that Defendant was one and a half to two car lengths behind the van.   *Id.* at 78-79.   He also points out that later in the stop, as depicted in the Dash Cam video, Trooper Hernandez stated that Defendant was following "way too close."   *Id.* at 80.   Thus, Defendant argues that Trooper Hernandez' testimony concerning the distance between the vehicles is not credible.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (citing *Viehman v. Schweiker*, 679 F.2d 223 (11th Cir. 1982); *United States v. Jennings*, 227 Fed. App'x 828, 829 (11th Cir. 2007) ("It is well-settled that we accord considerable deference to the district court's credibility findings.") (*citing U.S. v. Ramirez-Chilel*, 289 F.3d at 749)). "'The credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." *United States v. Hunter*, 663 F.3d 1136, 1141 (10th Cir. 2011). Here, the Court finds Trooper Hernandez' testimony to be credible. Taking into account Defendant's argument about Trooper Hernandez' statements to Defendant regarding his observation that Defendant was following "a little too close" or "way too close," the Court does not find these statements to be inconsistent. Trooper Hernandez consistently has testified that Defendant was following the van too closely and in violation of the Florida law. Whether the distance was "a little too close" or "way too close," based on Trooper Hernandez' observations, it was in violation of the statute.[7]

---

[7] The Court also finds persuasive the argument of counsel for the United States that there may have been some hyperbole in the trooper's initial statement, similar to when an trooper stops a car for going "a little too fast," when clearly the trooper means the opposite. Doc. 40 at 85. The Court reviewed the video here, and, as noted, finds the Trooper's testimony to be credible.

Moreover, Trooper Hernandez has over eighteen years of experience.   Doc. 40 at 7.   Based on his training and experience, his belief was that a reasonable distance to follow another vehicle is one car length per every ten miles per hour.   *Id.* at 11-12.   Trooper Hernandez has applied this standard on numerous occasions. *Id.* at 14. When Trooper Hernandez initially observed Defendant pass the location where he was posted, he stated that Defendant was only one and a half to two car lengths behind the vehicle in front, and Defendant was traveling approximately seventy-two miles per hour.   *Id.* at 24, 33.   Consequently, Trooper Hernandez initiated the traffic stop for violation of Fla. Stat. 316.0895(1).   The Court finds Trooper Hernandez' interpretation objectively grounded based on his training and experience.   Additionally, Trooper Hernandez observed from his posted position that Defendant's window tint was too dark, also in violation of Florida law.   Thus, based on the totality of the circumstances, the Court finds that Trooper Hernandez had probable cause to initiate the traffic stop.

### b. *Constitutionality of Florida Statute 316.0895(1)*

Defendant also challenges the constitutionality of Fla. Stat. 316.0895(1). Doc. 18 at 7.   Defendant alleges that the statute is unconstitutionally vague because ordinary people would have a difficult time understanding what is prohibited.   *Id.*, Doc. 40 at 81.   Defendant acknowledged in the suppression hearing, however, that other than in the Eleventh Circuit, which has not decided this specific issue, his argument consistently has been rejected in other federal circuits.   Doc. 40 at 81-82. The United States denies the statute is unconstitutionally vague, but further asserts

that even if the Court were to find it was unconstitutional the traffic stop was valid because the trooper relied on the statute in good faith, and the statute was presumptively valid at the time.   Doc. 20 at 9-10, 12.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."   *Graynard v. City of Rockford*, 408 U.S. 104, 108 (1972).   "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."   *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *See also United States v. Biro*, 143 F.3d 1421, 1426 (11th Cir. 1998). The doctrine requires that "a legislature establish minimal guidelines to govern law enforcement."   461 U.S. at 358 (citation omitted).   As the Eleventh Circuit noted in *Biro* "[t]here is no requirement, however, that statutes define every factual situation that may arise."   143 F.3d at 1430 (citation omitted).

Defendant primarily relies upon *State v. Stanko*, 974 P.2d 1132 (Mont. 1998), to support his argument that Fla. Stat. 316.0895(1) is unconstitutionally vague.   In *Stanko*, the Montana Supreme Court found that a Montana statute requiring a person to operate a vehicle "at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation" to be unconstitutionally vague because the average motorist would have no idea of the speed at which he or she would be violating the statute.   974 P.2d at 1137. Additionally, the court held that the statute permits discriminatory and arbitrary

enforcement that the void-for-vagueness doctrine was designed to prevent.   *Id.*

The Court finds the facts in that case distinguishable from the present case. In contrast to the testimony of Trooper Hernandez, the officer in *Stanko* offered no opinion regarding what a reasonable speed would have been at the time and place where the defendant was arrested.   *Id.* at 1136.   Moreover, the Montana attorney general, the chief law enforcement officer for the state, also was unable to specify what would have been reasonable for the defendant.   *Id.*   Thus, the court concluded that the average motorist would have no idea of the speed at which he or she would violate the statute, and thus the statute impermissibly delegates how fast is too fast on Montana's highways to officers, judges and juries on a subjective basis.   *Id.* at 1137.   Accordingly, the court found the statute be unconstitutional.   *Id.*

Here, however, based on his training and experience, Trooper Hernandez provided his opinion regarding what would have been a reasonable distance for Defendant to be following another vehicle under the circumstances.   Doc. 40 at 50. Trooper Hernandez told Defendant that if he was traveling at about seventy-two miles per hour, then a reasonable distance would be seven car lengths behind the vehicle in front of Defendant.   *Id.*   Moreover, Trooper Hernandez testified that he learned this standard during his training at the academy, and to his knowledge other officers apply this same standard.   *Id.* at 52.   Thus, the Court finds this case factually distinguishable from that relied upon by Defendant.

Moreover, while the Eleventh Circuit has not directly addressed the constitutionality of Fla. Stat. 316.0895(1), the weight of authority in other circuits

weighs against Defendant's argument.   In *Hunter*, the Tenth Circuit Court of Appeals analyzed the constitutionality of a Kansas statute identical to the Florida law at issue here.   663 F.3d at 1141.   The Kansas statute provides:

> The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.

*Id.*   The defendant in *Hunter* alleged that the statute was unconstitutionally vague because "the term 'reasonable and prudent' is too subjective to inform ordinary drivers as to its meaning, and the statute does not establish minimum standards to guard against discriminatory enforcement."   *Id.*   The court recognized that identical or similar "reasonable and prudent" statutes are common throughout the country and have been uniformly upheld.   *Id.* at 1142 (internal citations omitted). The court found that the Kansas following-too-closely statute was not unconstitutionally vague.   *Id.* at 1142.   The court reasoned that,

> imprecision in statutes such as the one here simply build in needed flexibility while incorporating a comprehensible, normative standard easily understood by the ordinary driver and giving fair warning as to what conduct on his or her part is prohibited. Further, references in these statutes to considerations such as speed, traffic and road conditions, channel enforcement.

*Id.*

The Court finds persuasive the Tenth Circuit's analysis, and does not find Fla. Stat. 316.0895(1) to be unconstitutionally vague.   Even if, however, the Court found the statute to be unconstitutionally vague, the exclusionary rule does not apply to evidence obtained by police who acted in objectively reasonable reliance upon a

statute even if the statute later is found to be unconstitutional.   *Illinois v. Krull*, 480 U.S. 340, 349 (1987); *see also Michigan v. DeFillippo*, 443 U.S. 31 (1979). "Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law."   *Id.* at 349-50.

In *DeFillippo*, the defendant moved to suppress drugs obtained during a search, and the district court denied the motion.   443. U.S. at 34.   Later, on appeal, the court reversed and remanded with instructions to suppress the evidence because the ordinance under which the defendant was arrested and searched was subsequently declared unconstitutionally vague.   *Id.* at 34-35.   The Supreme Court held that since the arrest was valid when made, the search was valid and the illegal drugs were admissible.   *Id.* at 36.   The Court noted that an officer should not be required to anticipate whether a court would later hold a statute unconstitutional when determining whether a person has committed an offense.   *Id.* at 37-38.

Defendant argues that the very fact officers have had to come up with their own standard to apply the Florida statute further demonstrates they knew the statute was vague and an ordinary person would not understand it.   Doc. 40 at 84. The Court rejects this argument.   Trooper Hernandez reasonably relied upon Fla. Stat. 316.0895(1) when he initiated the traffic stop.   Based on his extensive training and experience and that of other officers with whom he worked over the years, he concluded that Defendant was following too closely in violation of the statute.   At the time of the traffic stop, Fla. Stat. 316.0895(1) was presumptively valid.   Thus, even if this Court finds that the statute is unconstitutionally vague, which it does

not, the evidence found during the traffic stop is not subject to the exclusionary rule because Trooper Hernandez acted in objectively reasonable reliance upon the statute.

## IV.    Conclusion

The Court finds that Trooper Hernandez had probable cause to stop Defendant for following too closely in violation of Fla. Stat. 316.0895(1) and for window tint darker than the legal limit.    Additionally, the Court concludes that Fla. Stat. 316.0895(1) is not unconstitutionally vague.    Finally, even if the statute was declared unconstitutionally vague, the evidence still would be admissible because the trooper acted in objectively reasonable reliance upon the statute.

**ACCORDINGLY,** it is **RESPECTFULLY RECOMMENDED** that Defendant's Motion for Pre-Trial Suppression Hearing and Memorandum of Law in Support Thereof (Doc. 18) be **DENIED**.

**DONE** and **ENTERED** in Fort Myers, Florida on this 4th day of March, 2016.

CAROL MIRANDO
United States Magistrate Judge

Copies:
Counsel of Record